IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
CIVIL DIVISION

PATRICIA WEGGEL-LAANE )
3314 Alabama Avenue )
Alexandria, VA 22305 )
)
)
Plaintiff, )
)

v.

STEPHEN L. JOHNSON,
ADMINISTRATOR,
U.S. ENVIRONMENTAL PROTECTION )
AGENCY )
1200 Pennsylvania Avenue, NW )
Washington, DC 20460-0001 )
)
)
)
Defendant. )
)

Case: 1:07-cv-00657
Assigned To : Urbina, Ricardo M.
Assign. Date : 4/10/2007
Description: LAANE v. JOHNSON

## COMPLAINT

1. Plaintiff, Patricia Weggel-Laane ("Weggel") brings this employment discrimination action for compensatory damages, challenging the discriminatory and retaliatory actions of Defendant, the U.S. Environmental Protection Agency ("EPA") in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.* (Title VII").

2. On or about March 8, 2004, an EPA manager informed Ms. Weggel that she would no longer be permitted to work a part-time schedule, after approximately six years of positive work performance under that schedule. The EPA forced Ms. Weggel to accept a full-time schedule in retaliation for her opposition to her supervisor's campaign against an important

program critical to the retention of female employees, as well as that supervisor's discriminatory treatment of a female contractor associated with that program.

3.   The EPA created a hostile work environment when it subjected Ms. Weggel and other female employees to a barrage of sexually explicit comments at staff meetings as well as on other instances at the workplace.

## PARTIES

4.   Plaintiff Patricia Weggel-Laane is an Environmental Engineer in the Policy, Programs, and Oversight Branch ("PPOB") of the Safety, Health and Environmental Division ("SHEMD") in the U.S. Environmental Protection Agency. Ms. Weggel has been employed at the EPA since 1986 and is now GS-14, Step 8.

5.   Defendant Stephen L. Johnson is the Administrator of the U.S. Environmental Protection Agency, which is a federal government agency with headquarters located at 1200 Pennsylvania Avenue, NW Washington, DC 20460. Mr. Johnson is sued in his official capacity only.

## JURISDICTION AND VENUE

6.   The Court has jurisdiction over this action under 42 U.S.C. § 2000e-5. In addition, the Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, 1346.

7.   Venue is proper in this district because the Defendant EPA is headquartered in this district and the events that form the basis of this lawsuit occurred in this district.

8.   Ms. Weggel has exhausted her administrative remedies prior to filing this lawsuit. She filed her Complaint of Discrimination with the EPA on December 3, 2004, after completing the required EEO counseling in a timely manner. Ms. Weggel requested a hearing before an Equal Employment Opportunity Commission Administrative Judge ("EEOC") on October 19,

2005. The EEOC issued its decision on October 17, 2006, and the EPA issued its Final Agency Order implementing the EEOC's decision on January 9, 2007, which Plaintiff's counsel received on January 12, 2007. Ms. Weggel has filed this lawsuit within ninety days of receiving the EPA's Final Agency Order.

## FACTS IN SUPPORT OF RETALIATION CLAIM

9. At all times relevant to this Complaint, unless otherwise noted, Ms. Weggel's primary supervisor was PPOB Chief Howard Wilson; her second-line supervisor was Gerald Oakley, then-SHEMD Deputy Director, and her third-line supervisor was Dennis Bushta, SHEMD Director.

10. SHEMD is housed within what was then known as the Office of Administrative Services ("OAS"), the director of which is Richard Lemley.

11. In 1998, the EPA granted Ms. Weggel's request to work a part-time schedule. Ms. Weggel's managers in SHEMD were aware that she required the part-time schedule in order to care for her four children, three of whom have varied special needs.

12. In the mid-1990's, Julius Jimeno, then-SHEMD Director, and Howard Wilson asked Ms. Weggel to become involved with EPA's Maternal Wellness Program.

13. The EPA's Maternal Wellness Program ("Program") provides private lactation rooms and breast pumps so that working mothers can express breast milk while at work. The Program enables women to return to work shortly after the birth of a child by: (1) allowing them to maintain an adequate breast milk supply so that returning to work does not mean they must stop breastfeeding; and (2) relieving the painful and unsightly leaking of breast milk during working hours. Accordingly, one of the main purposes of the Program is to increase the number of women at EPA who return to work shortly after the birth of their children.

14. Ms. Weggel was instrumental in the development of the Maternal Wellness Program, including the design of room accommodations, and her work expanded the Program's scope. In 1998, the Agency recognized Ms. Weggel's role in the Program by giving her a cash incentive award. In granting her the award, EPA commended Ms. Weggel for developing "a simple, economical and safe program" and "sustain[ing] the implementation of this program while maintaining a high level of performance in her other work areas."

15. Notwithstanding the strong support of the Maternal Wellness Program from the highest levels of EPA management, Mr. Bushta did his best to undermine the Program by interfering with Ms. Weggel's efforts to establish sanitary lactation rooms and through his repeated derogatory comments about the program to Ms. Weggel and another woman associated with the program, Leah Henry. Mr. Bushta's interference began when he did not have supervisory authority over the Program, and increased once he became SHEMD Director.

16. As a result of Mr. Bushta's efforts, Ms. Weggel complained to her supervisor, Mr. Wilson, that Mr. Bushta was "chip[ping] away at the lactation program" by obstructing the construction of lactation rooms from being built with necessary features such as sinks and refrigerators.

17. In July 2003, SHEMD management contracted with Federal Occupational Health, part of the Department of Health and Human Services, to provide lactation services through a contract nurse named Ann Cagigas. Ms. Cagigas was a highly qualified professional with extensive experience with providing lactation services. As the Agency's Contracting Officer's Representative, Ms. Weggel was responsible for assigning tasks to Ms. Cagigas.

18. Once Ms. Cagigas arrived at SHEMD, Ms. Weggel became aware that Ms. Cagigas had been informed that there was no workspace available for her and that contractors

4

could not use the same space as other SHEMD employees. However, Ms. Weggel knew that workspace in SHEMD was available, and that other contractors were sharing that space with full-time employees. Historically, SHEMD had placed contractors in SHEMD workspace.

19. After Mr. Bushta proposed that Ms. Cagigas work from an off-site location, Ms. Weggel went to Mr. Wilson and Mr. Bushta on Ms. Cagigas's behalf, and suggested three alternative spaces nearby or controlled by SHEMD. Mr. Bushta rejected Ms. Weggel's suggestions, but temporarily assigned Ms. Cagigas to another employee's station.

20. Mr. Bushta also barred Ms. Cagigas from attending SHEMD staff meetings on the pretext that she was a contractor, even though other contractors had and did attend staff meetings for years without objection. Only occasionally was Ms. Weggel able to secure permission for Ms. Cagigas to attend staff meetings.

21. Additionally, Mr. Bushta and Mr. Oakley prohibited Ms. Cagigas from having any posters, equipment, or educational materials visible to anyone in SHEMD, chastised an employee for proofreading a monthly newsletter for women in the Maternal Wellness Program, and banned Ms. Cagigas from writing any more newsletters. Ms. Weggel complained to Mr. Wilson about the manner in which Ms. Cagigas was being treated.

22. Ms. Cagigas has described the "environment at EPA was probably the most unfriendly place I have ever worked, as far as working with supervisors . . . ."

23. Ms. Weggel informed Mr. Wilson that she felt that Mr. Bushta and Mr. Oakley had "subject[ed] [her] to a hostile work environment for her support of the maternal wellness program."

24. In late November 2003, Mr. Bushta cancelled the EPA's request for Ms. Cagigas's services, effective at the end of January 2004 (although he required Ms. Cagigas to

vacate SHEMD workspace at the end of December 2003), even though Ms. Cagigas's contract was supposed to have been for one year. Mr. Bushta attributed his decision to the cost of the program and Ms. Cagigas's "substantial use, as an FOH contractor, of EPA facilities and property."

25.     On December 4, 3003, Ms. Cagigas e-mailed the mothers participating in the Maternal Wellness Program, stating that "[t]he program is in big trouble as far as my services are concerned." Later, Ms. Cagigas explained that the "decision comes from Dennis Bushta who has wanted me out of here since day 1." She also stated that "Pat Weggel seems to think that there is some wiggle room but she has been told not to speak to me about it." An EPA employee commented in a separate email that Ms. Cagigas's treatment "just seem[ed] to smack of something close to sexism."

26.     Mr. Bushta learned of this exchange the next day, and demanded that Ms. Cagigas vacate her EPA workspace by December 8, 2003.

27.     Mr. Bushta has previously denied involvement in Ms. Cagigas's contract termination, asserting that "[t]he decision to terminate [Cagigas's] service[s] did not come from me . . . ."

28.     During this same period, in January 2004, Mr. Wilson informed Ms. Weggel that SHEMD managers were pressuring him to require her to work a full-time schedule. The Defendant has proffered various explanations for this action.

29.     At that time the decision was made, Mr. Bushta informed Mr. Wilson that Mr. Bushta "d[id] not see how we can continue to have [Ms. Weggel's] position operate on a part-time and limited basis."

6

30. Mr. Bushta has also testified that Ms. Weggel was required to return to a full-time schedule because SHEMD could not request any more Full-Time Equivalencies ("FTEs") unless he was fully utilizing all existing FTEs. Mr. Oakley has also asserted that "Mr. Bushta needed additional employees and could not request them while he had a GS-14 on part time status and a GS-15 on detail. Both had to be returned to full time status before he could demonstrate a need for additional positions."

31. However, Mr. Lemley, the Director of OAS, testified that Mr. Bushta never asked him "for any additional . . . FTE positions, in [SHEMD]" and that he never told Mr. Bushta that if he "didn't convert a part-time position into a full-time position, [Mr. Lemley] would not give him another FTE position."

32. Mr. Bushta has since conceded that he was not prohibited from asking for more resources, and may have made such a request before Ms. Weggel returned to work full-time.

33. For his part, Mr. Lemley has asserted that Ms. Weggel was needed to work full-time because demands on SHEMD increased after the events of September 11, 2001.

34. Defendant's official position, taken in the administrative proceedings below, attributes the decision to change Ms. Weggel's schedule to Mr. Wilson. Mr. Wilson has asserted that Ms. Weggel's position requires a full-time employee because of a study that committed PPOB to providing increased services to the Architecture, Engineering and Asset Management Branch ("AEAMB"), even though PPOB had already increased its level of service to AEAMB, and even though there was no indication in the years following the study that the work assigned to PPOB's then-existing employees actually increased.

35. On or about March 8, 2004, Mr. Wilson sent Ms. Weggel a memorandum informing her that she was required to return to work full-time.

36.     On March 22, 2004, Ms. Weggel delivered to Mr. Wilson a letter reiterating how burdensome it would be to her to return to work full-time given her family circumstances. In that letter, Ms. Weggel also expressed a willingness to explore alternative work arrangements, including working from home to maximize the time she was able to spend at her job, coming in to the office more often, or sharing her job with another employee. Ultimately, SHEMD management rejected all of these options.

37.     Ms. Weggel was required to begin working full-time on September 4, 2005, causing her significant and continuing emotional and physical strain, as well as financial cost.

38.     Prior to the Defendant's forced change in her work schedule, Ms. Weggel's supervisors were satisfied with her performance. She consistently received excellent performance evaluations, receiving performance rankings of "exceeds expectations" and "outstanding." In addition to the cash incentive award she received for her contribution to the Maternal Wellness Program, Ms. Weggel also received numerous awards throughout her EPA career, including a Bronze Medal Award, the Vice President's Hammer Award, and the EPA Unsung Hero Award.

### FACTS IN SUPPORT OF HOSTILE WORK ENVIRONMENT CLAIM

39.     Several employees of both sexes have complained about SHEMD management's mistreatment of women.

40.     In the Fall 2001, Mr. Bushta inquired as to whether a male employee who had recently become a father of twins was "'getting any [sex],'" and suggested that the employee may need another wife to take care of his sexual needs. A general discussion of male employees' sex lives ensued, during which Mr. Oakley offered his own anecdote about having sex by some railroad tracks. Ms. Weggel complained about these remarks conversation to Mr.

Wilson, her immediate supervisor. Leah Henry and Jeffrey Davidson, other EPA employees, also witnessed these and additional similar remarks and found them offensive to women.

41. On May 18, 2004, Mr. Bushta referred to Operation Top-Off, a terrorism-response exercise, as "Operation Jack-Off." Ms. Weggel reported to Mr. Wilson that she felt the statement and discussion was offensive, but Mr. Wilson did not take any action. Ms. Henry also witnessed this remark and deemed it offensive.

42. On June 2, 2004, during a discussion of the Quality Assurance Program and its applicability to EPA health units, Mr. Bushta commented that he wanted to "tell Tom Pastore [the Quality Assurance Manager] where he can put the rectal thermometer." Mr. Davidson also recalled this incident.

43. Also at the June 2, 2004 staff meeting, Mr. Bushta likened an employee whose retirement had just been announced to a "'guy flopping around like a cicada after having sex and waiting to die.'" Mr. Davidson also witnessed this incident. Ms. Weggel complained to Wilson about this statement.

44. On June 17, 2004, Mr. Bushta discussed at length a young female intern's body building and beauty pageant activities. Mr. Bushta then introduced another new (older) employee without any mention of her outside interests. Ms. Weggel complained to Mr. Wilson about these statements.

45. On August 18, 2004, Mr. Bushta discussed the availability of condoms and how they were used when he was in the military.

46. At another staff meeting, Mr. Bushta began a conversation about prostitution and pimps.

47. At a grammar training class, Skip Weisberg made a vulgar comment regarding female sexual anatomy, which he prefaced by noting that "'he might get into EEO trouble for making this comment.'" Mr. Oakley was present at this class and did nothing. Ms. Weggel complained to Mr. Wilson about this remark.

48. Mr. Davidson, another EPA employee, has observed that Mr. Bushta made "offensive sexual jokes or comments" during staff meetings, including "profanity-laced jokes about vaginas, vaginal and female sanitary products, [and] having sex."

49. Mr. Davidson observed an incident in which an employee referred to gay people as "fudgepackers" and "bitches." Neither Mr. Bushta nor anyone else in SHEMD management reprimanded the employee.

50. David Scott Smith, another EPA employee, observed Bushta making jokes about women's genitalia. These jokes were sometimes accompanied by Mr. Bushta's descriptions of intra-family violence within his own home.

51. Ms. Weggel made clear to Mr. Wilson that she felt that these comments were discriminatory based on her gender.

52. In approximately Fall 2004, as a result of receiving many complaints from SHEMD employees, OAS Director Lemley instructed Carolyn Davis, Director of EPA's Workplace Solutions, to conduct an investigation of the work environment at SHEMD. In conducting this study, Ms. Davis interviewed various employees at SHEMD, including Ms. Weggel.

53. Despite the fact that Ms. Davis had promised the participants that she would share her report summarizing her findings, this report has never been made available to SHEMD employees—even though many employees have requested a copy.

## CAUSES OF ACTION

### COUNT I (RETALIATION)
**(Violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e)**

54. Paragraphs 1-53 are incorporated herein by reference.

55. Ms. Weggel engaged in protected activity under Title VII when she complained to her supervisors about SHEMD management's actions regarding EPA's Maternal Wellness Program and SHEMD managers' mistreatment of the Program's contract nurse, Ann Cagigas.

56. Ms. Weggel suffered an adverse employment action when Defendant EPA forced her to maintain a full-time schedule against her will.

57. Defendant EPA, with malice and reckless indifference to Plaintiff's federally-protected rights, retaliated against Ms. Weggel in response to her protected activity in support of the Maternal Wellness Program.

58. As a result of Defendant's illegal actions, Ms. Weggel has suffered compensatory damages.

### COUNT II (HOSTILE WORK ENVIRONMENT)
**(Violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e)**

59. Paragraphs 1-58 are incorporated herein by reference.

60. As set out in detail in above, Defendant EPA violated Title VII by maintaining a hostile work environment for Plaintiff and other women in SHEMD with malice and reckless indifference.

61. As a result of Defendant's illegal actions, Ms. Weggel has suffered compensatory damages.

### PRAYER FOR RELIEF

WHEREFORE Plaintiff prays that this Court:

a. Award Plaintiff damages that will compensate her for her injuries caused by Defendant's discriminatory and retaliatory conduct.

b. Award Plaintiff her costs of suit, including out-of-pocket expenses and reasonable attorneys' fees.

c. Award such other relief as this Court deems just and proper.

PATRICA WEGGEL-LAANE

BY COUSNEL:

*[signature: Gary Kohlman (DC)]*

W. Gary Kohlman (No. 177527)
Dora V. Chen (No. 485200)
Bredhoff & Kaiser, P.L.L.C.
805 15th Street, N.W., Suite 1000
Washington, D.C. 20005
(202) 842-2600

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

07 - 657
H RMU

## I (a) PLAINTIFFS
Patricia Weggel-Laane

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** 88888
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**
W. Gary Kohlman
Bredhoff & Kaiser, PLLC
805 15th Street, N.W. Suite 1000
Washington, D.C. 20005
202-842-2600

## DEFENDANTS
Stephen L. Johnson, Administrator, U.S. Environmental Protection Agency

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF

Case: 1:07-cv-00657
Assigned To : Urbina, Ricardo M.
Assign. Date : 4/10/2007
Description: LAANE v. JOHNSON

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ● 2 U.S. Government Defendant
- ○ 3 Federal Question (U.S. Government Not a Party)
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

### ○ A. Antitrust
☐ 410 Antitrust

### ○ B. Personal Injury/Malpractice
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

### ○ C. Administrative Agency Review
☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

### ○ D. Temporary Restraining Order/Preliminary Injunction
Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

### ○ E. General Civil (Other) OR ○ F. Pro Se General Civil

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ G. *Habeas Corpus/ 2255* | ⦿ H. *Employment Discrimination* | ○ I. *FOIA/PRIVACY ACT* | ○ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☒ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ K. *Labor/ERISA (non-employment)* | ○ L. *Other Civil Rights (non-employment)* | ○ M. *Contract* | ○ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**
⦿ 1 Original Proceeding    ○ 2 Removed from State Court    ○ 3 Remanded from Appellate Court    ○ 4 Reinstated or Reopened    ○ 5 Transferred from another district (specify)    ○ 6 Multi district Litigation    ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
42 U.S.C. Sec. 2000e-5 (Retaliation and hostile work environment)

**VII. REQUESTED IN COMPLAINT**    ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ 500,000    Check YES only if demanded in complaint
JURY DEMAND:    YES ☒    NO ☐

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☐    NO ☒    If yes, please complete related case form.

DATE 4/10/2007    SIGNATURE OF ATTORNEY OF RECORD

JTC

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

   I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

   III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

   IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

   VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

   VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.